**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0618n.06
Filed: August 22, 2006

**No. 05-6536**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TAMMY J. LAWSON, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| JESSICA L. HENARD, CHRISTOPHER | ) | |
| LIVESAY, GERALD LAWSON, the heirs at law | ) | |
| of Tammy J. Lawson, | ) | |
| | ) | **OPINION** |
| Plaintiffs-Appellants | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: MOORE and GIBBONS, Circuit Judges; and ACKERMAN, District Judge.[*]

**HAROLD A. ACKERMAN, Senior District Judge.**

Plaintiff Tammy Lawson ("Lawson") was denied social security disability benefits by the

Social Security Administration ("SSA").[1] The denial of benefits was administratively appealed

and was affirmed by an Administrative Law Judge. Upon Lawson's appeal in the District Court,

---

[*] Honorable Harold A. Ackerman, Senior United States District Judge for the District of
New Jersey, sitting by designation.

[1] Lawson died while this action was on appeal. Her heirs-at-law have been substituted as
Plaintiffs-Appellants.

1

the Commissioner of the Social Security Administration ("Commissioner") moved for summary judgment dismissing Lawson's case, and affirming the Administrative Law Judge's denial of benefits. Lawson's heirs-at-law continue this appeal from the District Court's judgment. We find no reason to disturb the judgment of the ALJ and the District Court, and we therefore **AFFIRM** the judgment of the District Court.

## I. Background

### A. Lawson's Disability Application and Initial Hearing

Lawson filed an application for disability benefits on June 17, 2002, alleging the onset of disability on January 2, 2002. She was 41 at the time. Lawson alleged disability as the result of degenerative disc disease, bulging discs, cataracts, and depression. She was a high school graduate with past work experience as a school bus driver, van driver, fast food worker and clerk/cashier. Her claim for disability benefits was denied initially and upon reconsideration, after which Lawson requested a review hearing.

On April 23, 2003, Lawson appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). At the hearing, Lawson testified that she had been under medical care for the past 18 years for back problems such as bulging discs, arthritis and degenerative disc disease. (Tr. 365, 66.)[2] She stated that she had worked as a school bus driver in January 2002, but had left that job because it became difficult for her to perform her duties, because the pain she experienced was so severe that she could not depress the pedals of the vehicle. (Tr. 365, 66.)

---

[2] All citations are to the Transcript of Administrative Proceedings ("Tr.") prepared by the Social Security Administration Office of Appellate Operations.

She testified that since quitting her job, she did nothing during the day but rest on the couch.

Lawson also claimed that because of the pain and the inability to be productive, she had become depressed. (Tr. 372.) Lawson testified that her family physician, Dr. Ionescu, had recently referred her to a psychiatrist, Dr. Smith, for the first time two weeks before the hearing. Lawson indicated that she was scheduled to see a psychologist the week after the initial hearing. Lawson also testified that she had discontinued treatment with the Morristown Pain Clinic because they had accused her of things (*e.g.*, abuse of medications) that, according to Lawson, had not occurred. (Tr. 377.)

At the close of the April 23, 2003 hearing, the ALJ requested Lawson's pharmacy records, as well as Lawson's medical records from her treating physician and from the pain clinic. The ALJ stated that he would refer Lawson for a psychological examination. (Tr. 378.)

**B.      Lawson's Medical Records Before the Initial Hearing**

Lawson's counsel submitted her medical records to the ALJ after the initial hearing. Lawson's medical records indicated that on October 6, 1999, she had been seen by Dr. M. Blaine Jones, III, who had noted his concern with Lawson's use of prescribed pain medications. Lawson had prematurely run out of both Soma and Lortab, as she had been taking these drugs at twice the prescribed rate. (Tr. 206-07.) Dr. Jones indicated some concern that a person taking these medications at such a rate was employed as a school bus driver. (*Id.*) In response to Lawson's insistence that she needed the medications in such doses for her pain, Dr. Jones recommended that if the pain were that severe, Lawson should see a specialist. (*Id.*)

Dr. Jones noted that a recent spinal MRI taken on September 27, 1999 showed minor spinal stenosis (narrowing) at L4-L5, secondary to broad-based intervertebral disc bulging,

3

posterior intervertebral disc protrusion, hypertrophy (enlargement), and increasing size changes in the facet joints. (Tr. 134-35, 207.) Jones referred Lawson to an orthopedic specialist, John B. Raff, M.D. Dr. Raff examined Lawson on March 14, 2000. His physical examination noted that Lawson walked with a normal gait and could perform heel-and-toe walking. (Tr. 136.) Lawson demonstrated normal results for motor testing in all muscle groups, symmetric reflexes in knees and ankles, and full range of motion in her hips. (Tr. 137.) Dr. Raff reviewed the 1999 MRI and confirmed that it showed mild stenosis at L4-L5. (*Id.*) Dr. Raff indicated that due to Lawson's normal neurological responses, lack of spinal instability, and lack of any compelling problem, surgery was not recommended. (*Id.*) Dr. Raff suggested that Lawson perform stabilizing exercises, use special heels in her shoes, and attend a support group or pain clinic. (*Id.*)

On June 13, 2001, Lawson's family physician, Dr. Ionescu, who had prescribed Lortab, Nubain, Neurontin, Percocet, Robaxin, Soma and Vioxx at various times for Lawson's pain, recommended that Lawson be evaluated by a pain clinic. Lawson contacted the Morristown Pain Clinic and was seen by Michael Chavin, M.D. On July 5, 2001, Dr. Chavin noted in his records that Lawson had been taking up to six tablets of Lortab per day, though she had been prescribed three a day. (Tr. 169.) Dr. Chavin recommended that Lawson receive a series of lumbar epidural injections, and noted that because Lawson had been exceeding her dose of Lortab, he would, in the future, only provide her with prescriptions for a week-long supply of medications. (Tr. 171.)

After the initial hearing before the ALJ, Lawson went to a new physician, Dr. Sameh Ward, M.D., who was associated with a different pain clinic. Dr. Ward analyzed Lawson's 1999 MRI and interpreted the MRI to show "severe L5/S1 degenerative disc disease." (Tr. 315.) Dr.

4

Ward's notes indicate that Lawson walked with a normal gait, presented normal thoracic and lumbar spinal contours with normal range of motion, and exhibited normal results for deep tendon reflex and nerve root stretch tests. (Tr. 317.) Lawson's motor and sensory examinations were normal. (*Id.*) Dr. Sameh noted that Lawson exhibited "exaggerated high pain behaviors and [an] almost neurotic affect." (Tr. 315, 317.) Dr. Sameh also noted that he wanted to wean Lawson off of all of her pain medications. (Tr. 318.)

### C.     Lawson's Examinations for Disability Review

On July 31, 2002, as part of her disability insurance application process, Lawson went to Dr. Wayne Page for a physical examination. Dr. Page noted that Lawson's gait, posture, and appearance were unremarkable, but noted that during examination, Lawson exhibited "pain behaviors" such as grasping her back and calling out at "inappropriate times." (Tr. 176.) He also noted that Lawson gave "poor effort" when asked to touch her toes, and "no effort" when asked to perform a sit-up. (*Id.*) Lawson demonstrated normal motor function and reflexes in her legs, and performed leg raises from seated and prone positions. (*Id.*) Dr. Page recommended that Lawson be limited to lifting no more than ten pounds and determined that Lawson would have no difficulties with walking, standing, or sitting over the course of an eight-hour workday. (*Id.*)

On August 12, 2002, Lawson was examined by Alice Garland, M.S., a psychological examiner. Garland noted that Lawson's thought processes were organized but found Lawson's insight and judgment to be fair to poor. She estimated Lawson's intelligence as average to low-average. (Tr. 180.) Garland described Lawson's manner as "histrionic and dramatic." (*Id.*) Garland concluded that Lawson might have limitations in mental functioning and variability of

5

mood that might interfere with Lawson's ability to follow detailed instructions or work well with others. (Tr. 182.)

On August 13, 2002, Lawson's medical record was examined by Dr. Saul A. Juliao, a state agency reviewing physician, as part of Lawson's disability application. Dr. Juliao opined that Lawson could lift up to twenty pounds occasionally and ten pounds frequently, and could sit for six hours and stand or walk for six hours in an eight-hour workday. (Tr. 184.) Lawson's medical records were also reviewed by a disability determination services psychologist on August 15, 2002, who opined that Lawson "appears to function adequately from a mental standpoint." (Tr. 201.)

After the initial hearing with the ALJ, Lawson was again examined by Alice Garland, M.S., on June 4, 2003, pursuant to the ALJ's request for psychological evaluation of Lawson. The results of tests for intellectual functioning indicated that Lawson was in the "mildly mentally retarded" range. (Tr. 309.) Garland noted that this result seemed low for a high school graduate. Garland also administered memory tests that resulted in scores that seemed to represent low estimates of Lawson's true ability, and administered the Minnesota Multiphasic Personality Inventory (MMPI) which resulted in a profile that suggested exaggerated responses from Lawson. Garland cautioned that this test be analyzed with caution as a consequence of Lawson's exaggerated responses.

In sum, Garland opined that Lawson was extremely focused on her pain and health problems, and observed that Lawson may experience "secondary gains from taking on a sick role." (Tr. 311.) Garland diagnosed Lawson with low-average mental functioning, but noted

6

that this diagnosis should be viewed only as provisional, as the testing that day did not represent a reliable estimate of Lawson's abilities, due to Lawson's lack of focus and effort. (Tr. 312.) Despite this caution, Garland opined that Lawson would have some limitations in her ability to interact with supervisors and the public, and to respond appropriately to work pressures and changes in work. (*Id.*)

### D. Lawson's Supplemental Hearing

A supplemental hearing was held on September 23, 2003, to permit the ALJ to receive additional testimony. Dr. Susan D. Bland, a medical expert, Dr. Thomas E. Schacht, a psychological expert, and Dr. Robert Spangler, a vocational expert, testified at the supplemental hearing at the ALJ's request. None of these experts had examined Lawson, but the medical and psychological experts had reviewed Lawson's medical records. Dr. Bland concluded that, based on Lawson's medical records and her testimony at the hearing, Lawson did not have an impairment that qualified for disability insurance coverage. (Tr. 384.) However, Dr. Bland did concede that Lawson had some degenerative changes of the lumbar spine with mild narrowing of the canal and some hypertrophy, which would justify certain limitations on Lawson's ability to perform work. (*Id.*) Dr. Bland recommended that Lawson lift no more than twenty pounds occasionally and ten pounds more frequently and further recommended that Lawson refrain from repetitive bending and stooping. (*Id.*) Additionally, because of the pain medications that Lawson was prescribed, Dr. Bland cautioned that Lawson should refrain from climbing ladders, operating machinery, or driving company vehicles. (*Id.*)

Despite acknowledging these limitations, Dr. Bland did not find Lawson's claimed multiple impairments to be so severe as to meet or equal the requirements of any listed disability.

7

Notably, Dr. Bland referred to a 1999 MRI of Lawson's spine which indicated only mild findings of disc problems. (Tr. 388-89.) Moreover, Dr. Bland noted that orthopedic exam results showed that Lawson had a normal gait, as well as normal flexion, strength, sensation and reflexes, which caused Dr. Bland to conclude that there was little correlation between Lawson's claimed symptoms and the objective medical findings in the record. (*Id.*)

Dr. Schacht testified that he had reviewed Lawson's medical file regarding her symptoms of depression, and concluded that it was not possible to determine from the record whether or not Lawson's mental condition satisfied one of the listings dealing with mental health impairments. (Tr. 385.) Dr. Schacht explained that he had concerns about the accuracy and reliability of the conclusions drawn by Lawson's psychological examiners, given indications that Lawson had demonstrated a "lack of effort" in intellectual and memory examinations, and given the evidence in the record that Lawson had irregularly used her prescribed pain medications in a manner indicative of possible substance abuse. (Tr. 387.) Significantly, Dr. Schacht noted that Lawson's test scores in her June 4, 2003 examination with Alice Garland would place Lawson's intellectual functioning in the mentally retarded range. This was inconsistent with her school records, which indicated that Lawson graduated in the top third of her high school class and achieved a "B" in algebra. (*Id.*) Dr. Schacht also pointed to Lawson's MMPI profile results, which indicated that Lawson had given exaggerated responses. (*Id.*)

Additionally, Dr. Schacht noted that the records indicated that Lawson might have been improperly taking her pain medication, and that Lawson became angry and quit attending Dr. Chavin's pain clinic after being called in for a drug test. (Tr. 386.) Furthermore, the records indicated that Lawson had been rejected by another pain clinic after her records were reviewed.

8

(*Id.*)

The ALJ asked Dr. Schacht whether the limitations set out by Alice Garland were justified by the objective results of the tests administered by Garland. (*Id.*) Dr. Schacht testified that they were not, as Garland had written that the test results seemed to be inaccurate, because they indicated exaggerated responses and lack of effort by Lawson. (*Id.*) Dr. Schacht emphasized that one could not give accurate restrictions and limitations based upon unreliable test results. (*Id.*) On cross-examination, Dr. Schacht was asked whether Lawson's pain medications would have an effect on her ability to perform work-related activities. Dr. Schacht indicated that the answer would depend upon Lawson's tolerance for her medications. (Tr. 390.)

The ALJ also heard from vocational expert Robert Spangler. The ALJ asked Mr. Spangler to consider the available job options for a hypothetical individual with the following characteristics: a younger individual with a twelfth-grade education, limited to work involving the frequent lifting of ten pounds and the maximum lifting limit of twenty pounds, and limited to standing or walking only six hours a day, who could not perform repetitive stooping, bending or climbing actions, who could not work at heights, or with ladders or hazardous machinery, and who could not drive. Mr. Spangler estimated that approximately 55,000 jobs would exist in the regional economy for such a person. (Tr. 391-92.) Mr. Spangler identified such jobs as including cashier, interviewer, information clerk, general office clerk, and non-construction laborer. (Tr. 392.)

The ALJ then asked Mr. Spangler to alter his hypothetical to assume that the afore-mentioned person could not interact appropriately with the public, co-workers or supervisors; could not respond appropriately to changes in work routines; and would be moderately impaired

9

in her ability to carry out and remember detailed instructions.  (Tr. 392.) Mr. Spangler indicated that no jobs would exist for such a person.  (*Id.*)

E.      The ALJ's Decision

On September 26, 2003, the ALJ found that Lawson had a severe impairment, but was not disabled because she was capable of performing light work for which jobs exist in the national economy in significant numbers.  (Tr. 18.)  The ALJ found that Lawson had retained the residual functional capacity (RFC) to perform light work, although he did restrict her from driving, repetitive stooping or bending, climbing ladders, and working with heights or hazardous machinery.  (Tr. 22.)  Based on her RFC, the ALJ found that Lawson could not return to her former work as a school bus driver, but could work as a cashier, interviewer, information clerk, invoice clerk, factory messenger, general office clerk, and non-construction laborer.  (Tr. 24, 26.)

Specifically, the ALJ found that the medical evidence indicated that Lawson had degenerative disc disease with low back pain, an impairment that is deemed severe by the SSA regulations, but not severe enough to qualify as a disability under the relevant catalog of impairments in the SSA regulations.  The ALJ emphasized that Lawson's degenerative disc condition, while noted by several physicians, was always treated conservatively, without surgery. The ALJ rejected the assessment of Dr. Page, who opined that Lawson should be limited to lifting only ten pounds.  (*Id.*)  The ALJ noted that this conclusion is belied by the testing results, and the fact that Dr. Page noted that Lawson gave poor effort during testing. (*Id.*)

The ALJ rejected Lawson's claim of a mental health impairment completely.  In doing so, the ALJ rejected the conclusions of Alice Garland, the psychological examiner, regarding her recommended limitations for Lawson, based on Lawson's claimed difficulty in interacting with

10

others.  The ALJ found Garland's assessment to be "clearly inconsistent with the documentary evidence" and noted that Garland's own report indicates that Lawson failed to put forth good effort in testing and exaggerated her responses.  (Tr. 22.)  The ALJ concluded that the record failed to show that Lawson needed mental health treatment.  (*Id.*)  The ALJ also rejected the state agency assessment that concluded that Lawson was moderately limited by her mental problems and had experienced two episodes of decompensation.  (*Id.*)  The ALJ concluded that the assessment was not based on objective medical records but on Lawson's own self-serving statements and allegations of problems occurring long before the period of alleged disability. (*Id.*)

Finally, the ALJ held that Lawson's "credibility with respect to her symptoms and impairments is significantly diminished by her failure to follow-up with recommendations of treating physicians to seek psychiatric or mental health treatment, failure to take medications as prescribed, exaggeration of symptoms, her drug-seeking behavior, and failure to cooperate during IQ and MMPI testing."  (Tr. 23.)  Significantly, the ALJ noted that Lawson had returned to part-time work, albeit briefly, in April 2002 to pay for a car she had bought.  The ALJ concluded that Lawson's claims of pain and limitation were not credible to the extent Lawson alleged.

### F.    Lawson's Appeal of the ALJ's Decision

Lawson requested that her case be reviewed by the Appeals Council, and submitted additional evidence to the Appeals Council.  The Appeals Council denied review on May 28, 2004, which had the effect of affirming the ALJ's decision as the Commissioner's final decision on the matter.

11

On July 27, 2004, Lawson filed suit in the United States District Court for the Eastern District of Tennessee, requesting judicial review of the Commissioner's final determination and challenging the ALJ's determination that she was not disabled. Both sides filed motions for summary judgment in support of their positions. On August 22, 2005, the District Court issued an order granting the Commissioner's motion for summary judgment and affirming the denial of disability benefits. The District Court had jurisdiction to review the decision of the SSA pursuant to 42 U.S.C. § 405(g). Plaintiff timely filed an appeal of the decision of the District Court, and thus the Court of Appeals for the Sixth Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 42 U.S.C. § 405(g).

## II. Analysis

### A. Standard of Review

In this case, the SSA's Appeals Counsel denied review of Lawson's administrative appeal, and thus the ALJ's determination was adopted by the Commissioner as a final agency decision. Accordingly, on appeal, the ALJ's determination receives deferential review by the District Court and by this Circuit, under the "substantial evidence" standard. Section 405(g) of the Social Security Act provides that the Commissioner's findings are conclusive, provided they are supported by "substantial evidence." 42 U.S.C. §405(g); *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (recognizing deference to Commissioner's findings under "substantial evidence" standard). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's decision is entitled to this deference even if evidence exists in the record to

12

support an alternative result. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Accordingly, on review, neither the District Court, nor the Court of Appeals, may resolve conflicts in the evidence, or make credibility determinations. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997). Nor may a reviewing court reverse the ALJ's decision merely because the court would have decided the matter differently. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996).

The relevant legal analysis for a disability insurance determination is contained in the SSA regulations. 20 C.F.R. § 404.1520 provides a five-step evaluation process to determine disability. This regulation requires the decision maker to analyze the disability claim thus:

1. If the claimant is performing substantial gainful work, she is not disabled.

2. If the claimant is not performing substantial gainful work, her impairment(s) must be severe before she can be found to be disabled.

3. If the claimant is not performing substantial gainful work, and has a severe impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment (or impairments) meets or medically equals a listed impairment contained in Appendix, Supbart P, Regulation No. 4, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairment (or impairments) does not prevent her from doing her past relevant work, she is not disabled.

5. If the claimant's impairment (or impairments) prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The ALJ followed the above analysis, finding that with respect to the first two prongs,

13

Lawson was not performing gainful work and had a severe impairment, namely degenerative disc disease. Upon reaching the third element of the analysis, the ALJ, comparing the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations, determined that neither Lawson's claimed mental condition, nor her degenerative disc disease, met or equaled any listed disability in the regulations.

**B.      Lawson Has Not Met Or Equaled Any Listed Impairment**

In order to meet or equal the requirements of a listed impairment, a claimant must demonstrate specific findings that duplicate the enumerated criteria of the listed impairment. This equivalency must be based on medical evidence supported by acceptable clinical and diagnostic techniques. *Land v. Sec'y of Health and Human Svcs.*, 814 F.2d 241, 245 (6th Cir. 1986). In order for a claimant's condition to equate with a listed impairment, the claimant's condition must manifest all of the specified medical criteria for such impairment. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of the criteria, no matter how severe, does not qualify.").

**1.      Lawson's Back Condition Does Not Meet The Criteria Of Any Listed Impairment**

On appeal, Lawson insists that her back condition meets the requirements for listed disabilities under 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings, 1.04A, B, and C. Listing 1.04 refers generally to Disorders of the Spine. Listing 1.04A refers to evidence of nerve root compression characterized by specific clinical findings; Listing 1.04 B refers to spinal arachnoiditis, confirmed by an operative note or tissue biopsy, and Listing 1.04C refers to lumbar spinal stenosis that results in certain findings on diagnostic imaging techniques and certain specified physical limitations.

14

Lawson has not demonstrated that her impairments meet the strict requirements for these listed impairments. With respect to Listing 1.04A (nerve root compression), that listing requires a finding of limitation of motion of the spine and loss of motor reflex. Nothing in the record indicates any limitation in the range of motion of Lawson's spine or loss of motor reflex. Indeed, Dr. Sameh's notes of his examination of June 27, 2003 indicate a normal range of motion in Lawson's lumbar spine and an "unremarkable" result for motor and sensory examination. (Tr. 317.) Listing 1.04B (arachnoiditis) requires that a spinal arachnoiditis condition be confirmed by an operative note or tissue biopsy. Lawson has not had any back surgery or tissue biopsy and thus cannot satisfy Listing 1.04B.

Likewise, Lawson's back condition cannot satisfy the requirements of Listing 1.04C (Lumbar spinal stenosis). That section requires a finding that the claimant cannot ambulate effectively. Each of the examining physicians found Lawson to demonstrate a "normal" or "unremarkable" gait. Because Lawson can ambulate normally, she does not satisfy the requirements of Listing 1.04C.

Lawson's counsel attempts to argue that Dr. Ward's diagnosis of "severe" degenerative disc disease qualifies Lawson for disability benefits, but this bare assertion of severity and a listing of Lawson's claimed symptoms does not satisfy the analysis for disability as set forth in the SSA's regulations at 20 C.F.R. § 404.1520, in the absence of evidence of specific medical findings consistent with a particular listed impairment.

### 2. Lawson's Claimed Mental Condition Does Not Satisfy the Criteria for Any Listed Impairment

Lawson claims on appeal that her mental condition satisfies the criteria for an Affective

Disorder impairment (Listing 12.04). Lawson's argument is premised on the fact that Alice

Garland, the psychological examiner, noted that Lawson demonstrated both "major depressive

disorder, recurrent" and "personality disorder, NOS with borderline and dependent features

noted" (Tr. 312), and that the SSA's consultive examination expert listed a number of

psychiatric diagnoses for Lawson, including major depressive disorder (Tr. 201). However,

neither Garland nor the consultive examiner found that Lawson had satisfied all of the criteria

for Listing 12.04A. Notably, the consultive examiner explicitly determined that, while Lawson

had a medically determinable mental impairment, it did not precisely satisfy the diagnostic

criteria for Listing 12.04A. Moreover, nothing in the medical records indicated that Lawson

satisfied Part B of Listing 12.04, which required at least two of the following:

> * marked restrictions in activities or daily living;
>
> * marked difficulties in maintaining social functioning;
>
> * marked difficulties in maintaining concentration,
>   persistence or pace; or
>
> * repeated [i.e. three or more] episodes of decompensation,
>   each of extended duration.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listings, 12.04.

The consultive examiner did not rate Lawson as having any "marked" restrictions or

difficulties, but rather described Lawson's condition in these areas as "moderate." Moreover, the

examiner noted that Lawson may have had "one or two" episodes of decompensation (according

to Lawson), but this falls short of the three or more episodes required by the listing criteria.

Finally, the consultive examiner found that Lawson did not satisfy the Part C criteria for Listing

12.04 (a medically documented history of chronic affective disorder of at least two years'

16

duration).

Likewise, Alice Garland's reports do not indicate that Lawson satisfied the Part B criteria by having "marked" difficulties in the listed areas. Garland noted that, as far as activities of daily living is concerned, Lawson performed some housework, and lived with her husband and stepdaughters. Garland also indicated that Lawson did not have difficulties in social functioning. This evidence does not jibe with Lawson's claim that she satisfied the Part B criteria for Listing 12.04. The foregoing indicates that the ALJ did not err in rejecting Lawson's claim that she suffered from a listed mental impairment under the SSA regulations.

### 3. Lawson's Claimed Impairments In Combination Do Not Render Her Disabled

On appeal, Lawson argues that her claimed mental condition and her claimed back condition, when considered together, constitute an impairment of such severity that it would be a basis for disability eligibility. Lawson's argument consists of a list of symptoms, unattached to any creditable medical findings, that Lawson claims renders her disabled. This argument does not satisfy the criteria for disability determination based on multiple impairments contained in the SSA regulations at 20 C.F.R. § 404.1523. That section provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

17

20 C.F.R. §404.1523. Lawson has not demonstrated that her combined conditions "could be the basis of eligibility under the law" by satisfying any particular impairment listing. Moreover, Lawson's listing of symptoms, unmoored from particular medical findings, cannot satisfy the objective standards of the regulations.

Ultimately, Lawson's argument based on combined impairments fails because the ALJ determined that Lawson had no impairment based on mental condition. This finding was based on substantial evidence, in that the ALJ found that the claim of mental impairment was not borne out by record evidence, and was based upon intellectual and psychological testing results that were inaccurate or exaggerated. Because of the substantial deference afforded to the ALJ's determination, this Court cannot disturb the ALJ's finding of no mental impairment even if the record evidence might support a contrary result. Accordingly, the District Court did not err in upholding the ALJ's finding that Lawson was not entitled to disability based on either her back condition, her alleged mental condition, or a combination of both.

### 4. The ALJ Properly Considered Lawson's Limitations in Analyzing Her Residual Functional Capacity and the Availability of Appropriate Work

Lawson argues on appeal that she lacks the residual functional capacity (RFC) to perform any type of gainful activity. At the supplemental hearing, Lawson's counsel asked the vocational expert to add several potential psychological limitations to the hypothetical posited by the ALJ regarding the availability of jobs for a person with certain physical or behavioral limitations that preclude bending, stooping, using ladders and operating machinery. Specifically, Lawson's counsel asked the vocational expert if there were jobs for persons who, in addition to the physical limitations set by the ALJ, had an inability to: 1) interact with the public,

18

supervisors, and co-workers; 2) respond appropriately to changes in routine; 3) make judgments; and 4) understand,

remember and carry out detailed instructions. The vocational expert opined that there would be no jobs in the national economy for such a person.

The psychological and intellectual limitations espoused by Lawson are not supported by the record. The most relevant entries in the medical record appear to be the June 17, 2003 report form filled out by Alice Garland, which indicates that Lawson might have "moderate" difficulty with detailed instructions (Tr. 313) and "moderate to marked" limitations to interacting with others, responding to work pressures, and responding to changes in work routine (Tr. 314). However, the ALJ rejected Garland's assessment as having been premised on a testing session in which Lawson failed to demonstrate good effort in responding to testing. (Tr. 22.) Indeed, in her report from that session, Garland advised that the test results obtained were not a reliable estimate of Lawson's abilities. Moreover, the ALJ's rejection of Garland's assessment is supported by the testimony of Dr. Schacht, who opined that Garland's restrictions did not accurately reflect the objective testing that she had performed, as Garland's report admitted that the test results were not a reliable indicator of Lawson's abilities. (Tr. 387.)

Accordingly, the ALJ was well within his authority to reject Garland's assessment, as he had substantial evidence that the assessment represented inaccurate conclusions premised on unreliable test results. (Tr. 312.) *See Varley v. Sec'y of Health and Human Svcs.*, 820 F.2d 777, 779-80 (6th Cir. 1987) (ALJ may reject entry on RFC form that is not substantiated by medical data and is inconsistent with the physician's previous opinions). Because the ALJ's assessment

19

of Lawson's RFC, including his rejection of the psychological limitations proffered by Lawson's counsel, was based upon substantial evidence, this determination may not be disturbed upon appeal.

### III.  Conclusion

For the foregoing reasons, this Court AFFIRMS the judgment of the District Court.